## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Michael Reger,<br><br>    **Plaintiff**<br><br>v.<br><br>The Associated Press,<br><br>    **Defendant.** | Case No. 23-cv-02983-WMW-DLM<br><br>**DEFENDANT THE ASSOCIATED PRESS'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT** |

## INTRODUCTION

Plaintiff Michael L. Reger's very public history as a long-troubled executive of publicly-traded oil and gas companies is detailed across voluminous civil and criminal court filings in federal and state courts across the country.  That history includes paying nearly $8 million to settle charges against him brought by the U.S. Securities and Exchange Commission ("SEC"), having his conduct discussed in a federal criminal indictment against his business partner (who is now in prison), being fired by a company he founded, weathering at least two shareholder lawsuits (and losing one), and availing himself of the judicial system to file at least one prior defamation lawsuit.

Now, in the present action, Reger implausibly alleges defamation again, this time by Defendant The Associated Press ("The AP") for reporting on his legal troubles.  At the center of Reger's lawsuit is a report The AP published on June 16, 2022 about a federal jury verdict finding Reger liable for securities fraud in a class action lawsuit filed by one of his companies' shareholders.  Reger complains that The AP incorrectly described the

jury as having "convicted" him of securities fraud, when in fact the verdict came in a civil trial. He claims this description of the jury verdict damaged his already-dubious reputation to the tune of $50,000,000.

The AP's use of "convicted" to describe the verdict was a regrettable mistake (and one it corrected soon after first learning of it through the filing of this lawsuit). But it was not an error that gives rise to liability, and Reger's claims for defamation and intentional infliction of emotional distress ("IIED") should therefore be dismissed as a matter of law. For purposes of reporting on Reger's leadership of public companies and the controversies surrounding his professional life, he is a limited purpose public figure. Therefore, he must, but cannot, plausibly allege that The AP published the challenged statements either with knowledge of their falsity or with a high degree of subjective awareness of their probable falsity—i.e., with "actual malice." Reger presents no facts from which to plausibly infer that The AP made anything other than an honest mistake, and as numerous courts have held, a mistake does not constitute actual malice. Further, any reasonable person who read The AP's news report would have understood that Reger was found civilly liable.

Accordingly, Reger's Complaint fails to state a claim upon which relief can be granted, amendment is futile, and The AP respectfully requests that the Court dismiss Reger's claims with prejudice.

## STATEMENT OF FACTS[1]

### A. Plaintiff Michael L. Reger

Before his questionable business activities began catching up to him, Plaintiff

Michael L. Reger ("Plaintiff" or "Reger") was "very successful financially and lived the

high life," with "very nice cars," "very large boats" and "travel[ing] on private planes"

Decl. of Isabella Salomão Nascimento ("Nascimento Decl.) Ex. A at 966:3-8.  Socially,

Reger was known for throwing "barbeque[s] in his backyard for a thousand of his closest

friends and family, literally . . . a thousand people. . . And these were not, you know,

burgers and hot dogs.  These were rock and roll bands and hired firework shows and

pretty flamboyant."  *Id.* at 271:5-12.

Professionally, Reger "has been primarily involved in the acquisition of oil and

gas mineral rights for his entire career.  Mr. Reger began working the oil and gas leasing

business for his family's company, Reger Oil, in 1992 and worked as an oil and gas

---

[1] This Motion cites to various court filings in prior proceedings involving Reger.  The Court may properly take judicial notice of these records without converting this Motion to one for summary judgement.  *See Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) ("The district court may take judicial notice of public records and may thus consider them on a motion to dismiss."); *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 802-03 (8th Cir. 2002) (judicial notice of EEOC charge); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir. 2001) ("The executives' stock transactions are documented in public filings required to be filed with the SEC, which other circuits have considered on a motion to dismiss."); *Spencer v. United States*, 2023 U.S. Dist. LEXIS 140136, at *1 (D. Minn. Aug. 11, 2023) (judicial notice of indictment and allegations in the indictment); *EEOC v. BNSF Ry. Co.*, 2011 U.S. Dist. LEXIS 63933, at *8 n.1 (D. Minn. May 16, 2011) ("The Court may take judicial notice of records filed publicly in another court."); *see also Kramer v. Time Warner*, 937 F.2d 767, 774 (2d Cir. 1991) ("[A] district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC").

landman for Reger Oil from 1992 until co-founding . . . Northern Oil and Gas, Inc.

("Northern")—in 2006." *Id.* Ex. B at 2.  As one former employee testified, Reger was

"very highly thought of in the oil and gas space," and being associated with him and

using his name in conversations helped the careers of those around him.  *Id.* Ex. A at

967:9-16.  Reger has also been the frequent subject of media reports, both before and

after his legal trouble started, including, as detailed in a civil complaint against Reger,

profiles in the *Star Tribune*, and in *Forbes Magazine*'s list of "America's Most Powerful

CEOs 40 and Under" in 2012 and 2013.  *Id.* Ex. C at ¶¶ 104-108; *see also* Decl. of Leita

Walker ("Walker Decl.") (collecting news reports).[2]

Yet over the past several years—and long before The AP published the report at

issue here—Reger's once-rising star fell rapidly and publicly, and he is now known for

something else: his participation in an elaborate scheme orchestrated with his then-

business partner Ryan Gilbertson to manipulate the stock price of Dakota Plains in order

---

[2] The AP offers these articles not for the truth of their contents but to demonstrate
Reger's frequent appearance in media reports and his access to channels of mass
communication.  *See infra* § I.b.  Accordingly, the Court may properly take judicial
notice of these articles.  *See Levitt v. Merck & Co.*, 914 F.3d 1169, 1175 (8th Cir. 2019)
(Colloton, J., dissenting) ("The district court properly took judicial notice of several peer-
reviewed journal articles, media reports, and public court records"); *Price v. Viking
Press*, 625 F. Supp. 641, 645-46 (D. Minn. 1985) (taking judicial notice of media stories);
*Barron v. South Dakota*, 2010 U.S. Dist. LEXIS 105886, at *9-10 (D.S.D. Sept. 30,
2010) (collecting cases from the Third, Sixth, Ninth and Tenth Circuit Courts of Appeals
and noting that "[c]ourts may properly take judicial notice of newspapers and other
publications as evidence of what was in the public realm at the time, but not as evidence
that the contents in the publication were accurate."), *aff'd on other grounds sub nom.
Barron v. S.D. Bd. of Regents*, 655 F.3d 787 (8th Cir. 2011).

4

to rake in millions of dollars for their own benefit.  As a result of this scheme, Reger has

played a central role in numerous investigations and lawsuits, both civil and criminal, and

he has filed at least two defamation lawsuits, including this one, to shut down any

discussion about his legal woes.  He has also been the subject of numerous press articles

about this scheme and its fallout, including in December 2015 "when media outlets

reported that Reger was being investigated by [the SEC] for his role in a stock

manipulation scheme" and in August 2016 when "news outlets reported that Reger had

received a Wells Notice,"  *Gruber v. Gilbertson*, 2021 U.S. Dist. LEXIS 113729, at *4,

*16 (S.D.N.Y. June 17, 2021) ("*Gruber I*"); *see also* Walker Decl.

## B.  Defendant The Associated Press

Defendant The Associated Press ("The AP") is an independent global news

service that publishes more than 2,000 articles per day.  The AP distributes these articles

via its wire service to membership news organizations around the world, which in turn

publish the articles to their own audiences.

## C.  Criminal and Civil Proceedings Related to Dakota Plains

Prior to publication of The AP report at issue here, Reger has been at the center of

at least *six* civil and criminal legal proceedings related to a scheme in which he and

Gilbertson manipulated Dakota Plains' stock prices and defrauded their shareholders out

of millions of dollars.[3]

---

[3] For the Court's convenience, a chronological list of proceedings is included in the
attached Declaration of Leita Walker.

Reger and Gilbertson founded Dakota Plains in 2008.  *See Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 476 (S.D.N.Y. 2022) ("*Gruber II*").  This was their second venture together—the first being Northern Oil and Gas ("NOG") in 2006, which "was scrutinized by the financial press for insider trading."  *Gruber I*, 2021 U.S. Dist. LEXIS 113729, at *4.  It was perhaps not surprising, then, that Reger attempted to hide his ownership of the Dakota Plains "in part to prevent negative publicity and action from investors who had short-sold" NOG's stock.  *Gruber II*, 628 F. Supp. 3d at 476.

The men named Reger's father as chief executive officer of Dakota Plains, and Gilbertson's father as president and treasurer.  Nascimento Decl. Ex. A at 229:17-19; *see also Gruber I*, 2021 U.S. Dist. LEXIS 113729, at *5.  But as Gilbertson's father testified, Reger and Gilbertson were the ones making all the decisions behind the scenes.  Nascimento Decl. Ex. A at 231:20.  As detailed in an indictment of Gilbertson for his involvement in the stock scheme:

> in or about November 2008, defendant GILBERTSON and Individual A caused Dakota Plains to be incorporated.  In order to conceal their involvement in the company, defendant GILBERTSON and Individual A installed their fathers as CEO and President of Dakota Plains and as the company's two-person board of directors.  However, despite not having any formal positions at the company, defendant GILBERTSON and Individual A retained control over Dakota Plains and made all material decisions for the company.

*Id.* Ex. D at 3 ¶ 3.[4]  To the extent there was any ambiguity around who "Individual A" was, the Government explicitly named Reger in its trial brief: "In order to further conceal

---

[4] The Court may properly take judicial notice of this document as a federal criminal indictment.  *See supra* n. 1.  Further, because Reger's Complaint asserts the half-truth that the "'indictment' issued by the SEC regarding Dakota Plains 'didn't mention Reger'"

their involvement in the new venture, Gilbertson and Reger installed their fathers . . . as CEO and President of Dakota Plains, respectively.  Their fathers held these positions in name only."  *Id.* Ex. E at 3.

In 2012, Reger and Gilbertson decided to take Dakota Plains public.  To do so, they used a legal maneuver called a "reverse merger," in which they purchased a "public 'shell' company": "a publicly traded company that had owned a now-defunct tanning salon in Salt Lake City."  *United States v. Gilbertson*, 970 F.3d 939, 943 (8th Cir. 2020). In December 2015, however, the *Star Tribune* "reported that federal authorities had been investigating a price spike in the stock of Dakota Plains after it went public in 2012, 'resulting in a windfall for investors who held promissory notes with an unusual payout feature.'"  Nascimento Decl. Ex. C at 38 ¶ 140; *see also Gruber I*, 2021 U.S. Dist. LEXIS 113729, at *16 ("when media outlets reported that Reger was being investigated by for his role in a stock manipulation scheme, the share price sank another 10%.").  As further detailed in subsequent court records, it would ultimately be revealed that Gilbertson spearheaded a scheme through which he, Reger, and a few select others, profited massively at the expense of the company.  Specifically, "Gilbertson arranged for the company to issue notes worth millions of dollars to himself, to Reger, and to their friends, family, and entities controlled by them," some of which included an "additional payment

---

(it referred to him by pseudonym), the Court may properly take judicial notice of that indictment as it is a "document[] necessarily embraced by the complaint" and thus is not a "matter[] outside the pleading."  *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012).

provision" "that provided for a bonus payment tied to Dakota Plains' stock price at or shortly after the start of its public trading." *Gruber II*, 628 F. Supp. 3d at 476.  Indeed, as a Dakota Plains employee testified against Gilbertson, when the company went public "we had $9 million of real money that came in the door.  After 20 days of being publicly-traded, we now owed $42 million to the initial noteholders."  Nascimento Decl. Ex. A at 400:6-8.  As one court noted, "*Gilbertson and Michael Reger were the architects of the fraud*."  *Gruber I*, 2021 U.S. Dist. LEXIS 113729, at *4 (emphasis added).

As a result of this scheme, Gilbertson and his associate Douglas Hoskins were indicted on federal charges, including as to Gilbertson, 15 counts of wire fraud, conspiracy to commit securities fraud, and six counts of securities fraud.  *See* Nascimento Decl. Ex. D.  Reger was not named as a criminal defendant, but he loomed large throughout the proceeding.  He was identified as "Individual A" in the indictment. *See id.* at 3.  He was later explicitly named in the Government's Trial Brief, s*ee id*. Ex. E at 4. And he was discussed during the testimony of 12 witnesses.  *See id.* Ex. A (Dkt. 238: Kary, W. Gilbertson, Claypool; Dkt. 240: Howells; Dkt. 241: Shermeta; Dkt. 242: Evenstad; Dkt. 243: Gibson, Wong; Dkt. 244: Bennett, Nerhus, Brady; Dkt. 245; R. Gilbertson).  Gilbertson was ultimately convicted of all but one charge, sentenced to 12 years in prison, and ordered to pay more than $15 million in restitution.  *Gilbertson*, 970 F.3d at 942 (affirming in full the jury verdict).  Hoskins was convicted of six charges and sentenced to two years in prison. Nascimento Decl. Ex. F.  Then "[i]n December 2016, . . . Dakota Plains filed for bankruptcy protection  . . . . At the time of the filing, its stock was worthless."  *Gruber I*, 2021 U.S. Dist. LEXIS 113729, at *17.

8

Though one of its "architects," *id.* at *4, Reger was never charged criminally in the scheme, though he did "fully cooperate[] with the investigations" into Dakota Plains. Nascimento Decl. Ex. G at 2. However, he faced two civil proceedings with significant impact. First, Reger faced a civil action by the SEC for his failure publicly to report his share holdings, which resolved when he paid a hefty fine and disgorged the money he made in connection with his investments in Dakota Plains. Nascimento Decl. Ex. H. As the SEC explained,

> Reger and Gilbertson controlled the company behind the scenes, and they used their influence to obtain significant financial benefits for themselves. . . . [A]t the time Dakota Plains first became public, Reger beneficially owned approximately 21.4% of its stock, but he divided his holdings among ten accounts in different names to avoid the public disclosure requirements of . . . the Exchange Act.

*Id.* at 2. The SEC found that Reger violated four provisions of federal law, and in order to settle these charges, Reger paid $6,500,000 in disgorgement, $669,365.85 in interest, and a fine of $750,000—together totaling nearly $8 million. *Id.* at 6.

Second, Reger was named as a defendant in a Dakota Plains shareholder lawsuit in which, "by a preponderance of the evidence," he was found liable for "intentionally defraud[ing] investors at [Dakota Plains] by concealing his substantial ownership of the company." *Gruber II*, 628 F. Supp. 3d at 475. As the Hon. Judge Rakoff held in a post-trial motion, Reger had acted "[i]n violation of the securities laws," and "[t]here was also sufficient evidence to conclude that Reger 'was in some meaningful sense a culpable participant in the fraud perpetrated by' Dakota Plains." *Id.* at 476, 491.

**D. Reger's Civil Proceedings Related to NOG**

Reger's various entanglements with the SEC and the civil and criminal justice systems ultimately cost him his job at NOG and resulted in further legal and financial troubles for him, which were also the subject of significant public scrutiny. When the SEC began investigating Reger's involvement in Dakota Plains, he was CEO, Director and Chairman of the Board of Directors for NOG. But after he disclosed that he had received a "Wells Notice," which is a formal notice from the SEC that the agency was planning to bring an enforcement action against him following an investigation into possible securities-law or regulatory violations, NOG terminated Reger. *See* Nascimento Decl. Ex. I; *see also Gruber I*, 2021 U.S. Dist. LEXIS 113729, at *16 (In August 2016, "news outlets reported that Reger had received a Wells Notice"). Upon Reger's termination, NOG filed a form with the SEC disclosing "that Michael Reger had been terminated as the Company's chief executive officer and ceased being a member of the Company's board of directors," and that NOG did not believe he would be entitled to any severance payment. Nascimento Decl. Ex. I; *id.* Ex. J at ¶¶ 9, 31.

Reger immediately filed a civil lawsuit against NOG for various claims, including defamation and breach of contract, alleging that NOG's termination notice and SEC filing conveyed he "was terminated for cause," and that such a statement had "harmed and will continue to harm Mr. Reger's reputation." *Id.* Ex. J at ¶ 33. As Reger argued, although NOG did not explicitly state that Reger had been fired for cause, "[s]ophisticated businesspeople and investors – the most likely audience to Northern's statement, whose opinion is crucial to Reger's reputation – understand perfectly well

what is implied by the statement . . . ."  *Id.* Ex. K at 3.  In Reger's telling, NOG's public statements "*destroy[ed] his reputation.*"  *Id.* at 2 n.1 (emphasis added).

One day after Reger filed his lawsuit against NOG, the company's shareholders filed a lawsuit against Reger, NOG and others alleging that NOG had a duty to disclose Reger's involvement with Dakota Plains and the legal exposure to Reger and NOG through the SEC investigation of Dakota Plains, which a court later dismissed.  *See Fries v. N. Oil & Gas*, 285 F. Supp. 3d 706, 711, 715 (S.D.N.Y. 2018).

### E.  The Challenged Report

In June 2022, a federal jury found Reger liable for securities fraud in the Dakota Plains shareholder lawsuit.  Two days later, the *Star Tribune* reported the result under the headline "Jury finds Minnesota oilman Michael Reger liable for Dakota Plains securities fraud."  Compl. Ex. B.  Later that same day, The AP published a report under the headline "Former Minnesota oil executive convicted of securities fraud."  Compl. Ex. C (the "Report").  The Report includes the following statements about Reger, only a few of which he challenges:

- "A former oil industry executive from Minnesota . . . has been convicted in a stock manipulation scheme."

- "A federal jury in New York on Tuesday found Michael Reger guilty of securities fraud, wrapping up *a shareholder lawsuit* filed five years ago against Reger and Ryan Gilbertson." (Emphasis added).

- "Reger was acquitted of insider trading."

- "The suit alleges that Reger and Gilbertson intentionally manipulated the price of Dakota Plains stock in its first 20 days of trading."

11

- "A federal judge earlier this month preliminarily *approved a $14 million settlement between Dakota Plains shareholders and several other directors and executives of the now-defunct company.*" (Emphasis added).

- "Reger said he 'declined to settle because I believe I did not do anything wrong and did not harm the company's shareholders. In fact, my family was the largest shareholder in the company even when it filed for bankruptcy.'"

- "U.S. District Court Judge Jed Rakoff will decide on *any damages Reger must pay to shareholders.*" (Emphasis added).

The Report also includes statements about Reger's former business partners, which are true and which Reger does not (and could not) challenge:

- "Gilbertson was convicted in 2018 and sentenced to 12 years in prison for wire fraud, securities fraud and conspiracy to commit securities fraud."

- "Gilbertson agreed to testify against Reger as part of his settlement, but he doesn't have to pay damages, the Star Tribune reported."

- "A third defendant in the case, Douglas Hoskins, was sentenced in 2018 for two years in prison for his role in the scheme."

Compl. Ex. C.

### F. Reger's Lawsuit

Reger does not allege that The AP had any knowledge of any error in its Report prior to receiving the Summons and Complaint on September 26, 2023. Certainly, he does not allege that he ever demanded a retraction over the 15 months the Report was published online, which is what people interested in mitigating harm to their reputations typically do.[5] Rather, without any warning, Reger filed the present lawsuit against The

---

[5] Shortly after receiving the Complaint, on October 4, 2023, The AP published a corrected version of the report under the headline "Minnesota oil executive found liable in securities fraud lawsuit." *See Minnesota oil executive found liable in securities fraud*

AP alleging four causes of action arising from its Report, including defamation, defamation by implication, defamation *per se*, and IIED.  Compl. ¶¶ 59-104.  Reger alleges that The AP knew he had not been "convicted" of criminal charges because the Report linked to the *Star Tribune* article published earlier that day "that correctly and properly reported on the civil jury verdict."  Compl. ¶ 42.  Reger alleged that he "suffered damages in excess of $50,000,000.00."  *Id*. ¶ 104.

## LEGAL STANDARD

A motion filed pursuant to Rule 12(b)(6) tests whether a complaint has "state[ed] a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion filed pursuant to this rule, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  And "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements' . . . are not enough 'to raise a right to relief above the speculative level.'"  *Kiefer v. Isanti County*, 71 F.4th 1149, 1153 (8th Cir. 2023) (cleaned up).

Although the *Iqbal/Twombly* standard governs all civil litigation in federal courts, it takes on particular importance in the context of defamation claims, given the risk that

---

*lawsuit*, APNews.com (Oct. 4, 2023), https://apnews.com/article/politics-minnesota-minneapolis-lawsuits-b8ca96f4fd87c2801b7ba9dbdd9d5278.

such cases will inhibit the media's exercise of their First Amendment rights. *See, e.g.*, *Time v. Hill*, 385 U.S. 374, 389 (1967) (recognizing that defamation suits can impose "grave risk of serious impairment of the indispensable service of a free press in a free society"); *N.Y. Times v. Sullivan*, 376 U.S. 254, 279 (1964) (holding that a rule "compelling the critic of official conduct to guarantee the truth of all his factual assertions . . . dampens the vigor and limits the variety of public debate" and "is inconsistent with the First and Fourteenth Amendments").

## ARGUMENT

Under Minnesota law, a defamation plaintiff must prove four elements:

(1) the defamatory statement was communicated to someone other than the plaintiff; (2) the statement is false; (3) the statements tends to harm the plaintiff's reputation and to lower the plaintiff in the estimation of the community; and (4) the recipient of the false statement reasonably understands it to refer to a specific individual.

*Larson v. Gannett Co.*, 940 N.W.2d 120, 130 (Minn. 2020). Further, when faced with a defamation claim, courts must determine the level of fault with which the allegedly defamatory statement was communicated—whether without "reasonable care" or with "actual malice"—which hinges on the status of the plaintiff, whether they be an "all purpose" public figure, a "limited purpose public figure" or a "private figure." *Jadwin v. Minn. Star & Tribune*, 367 N.W.2d 476, 484, 491 (citing *Gertz v. Robert Welch*, 418 U.S. 323, 345 (1974)). As argued below, for purposes of Reger's leadership of public companies in the oil and gas industry—and reporting on his related legal troubles—he is a limited-purpose public figure who must plausibly allege that The AP published the challenged report with actual malice. *See Jadwin*, 367 N.W.2d at 480, 484; *see Nelson*

*Auto Ctr. v. Multimedia Holdings*, 951 F.3d 952, 958 (8th Cir. 2020) ("[E]very circuit that has considered the matter has applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice.").

Reger simply has not pleaded and cannot plead this level of fault, which requires allegations that, if true, would prove by *clear and convincing* evidence that The AP published the challenged statements either with knowledge of their falsity or with a high degree of subjective awareness of their probable falsity. *See Nelson*, 951 F.3d at 958. Indeed, the face of the Report shows a good-faith attempt to accurately describe a civil verdict despite the mistaken use of terms most often associated with criminal proceedings.

## I.     PLAINTIFF IS A LIMITED PURPOSE PUBLIC FIGURE

A limited purpose public figure is one who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz*, 418 U.S. at 351. Whether a plaintiff is a limited purpose public figure is a question of law for courts to decide. *Lundell Mfg. v. ABC*, 98 F.3d 351, 362 (8th Cir. 1996). Under Minnesota law, there are three relevant considerations: "(1) whether a public controversy existed; (2) whether the plaintiff played a meaningful role in the controversy; and (3) whether the allegedly defamatory statement related to the controversy." *Chafoulias v. Peterson*, 668 N.W.2d 642, 651 (Minn. 2003).

As discussed below, Reger is a limited purpose public figure. *First*, Reger's illegal activities in the oil and gas industry—in particular, his orchestration, alongside

Gilbertson, of a stock manipulation scheme through a public company with private investor shareholders—constitutes a public controversy. *Second*, Reger played a central and pivotal role in that controversy, not only as a participant and beneficiary of the scheme, but also as the target of a high-stakes SEC investigation; a civil defendant in a successful shareholder lawsuit; a person of significant focus in the criminal case against his business partner; and a plaintiff in a defamation and wrongful termination lawsuit against the company he founded. *Third*, The AP Report was focused entirely on judicial proceedings arising from that controversy. Accordingly, Reger must, but cannot, plausibly allege that The AP published the Report with actual malice, and on this basis, Reger's claims for defamation fail as a matter of law.

### a.  The Dakota Plains stock price manipulation scheme and the resulting legal and regulatory proceedings constitute a public controversy

"A public controversy is a dispute that 'has received public attention because its ramifications will be felt by persons who are not direct participants.'" *Chafoulias*, 668 N.W.2d at 651-52. In determining whether a public controversy exists, courts look at two elements: "(1) there must be some real dispute that is being publicly debated; and (2) it must be reasonably foreseeable that the dispute could have substantial ramifications for persons beyond the immediate participants." *Id.* at 652. Stated another way, "[i]f it is evident that resolution of the controversy will affect people who do not directly participate in it, the controversy is more than merely newsworthy and is of legitimate public concern." *Silvester v. ABC*, 839 F.2d 1491, 1494-95 (11th Cir. 1988); *see also Waldbaum v. Fairchild Publ'ns*, 627 F.2d 1287, 1297 (D.C. Cir. 1980).

At the time The AP published its Report, the Dakota Plains stock scheme had been a public controversy for more than eight years. The scheme resulted in the loss of millions of dollars to individual shareholders of Dakota Plains (i.e., "persons beyond the immediate participants"), the bankruptcy of the company, the conviction and imprisonment of two men, a shareholder lawsuit related to Reger's leadership in NOG, and a second shareholder lawsuit in which Reger was found personally liable. Reger also personally paid $8 million to settle civil charges brought against him by the SEC, and he lost his job at NOG.

These public proceedings, all of which arose from or were related to criminal prosecutions, "are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975). Indeed, numerous courts around the country have found that public controversies exist in similar scenarios. *See Stepnes v. Ritschel*, 663 F.3d 952, 964 (8th Cir. 2011) (debate over legality of house raffle a matter of public controversy because the "issues had ramifications beyond the contest participants."); *Silvester*, 839 F.2d at 1493 ("The public is legitimately interested in all matters of corruption" and "the public has a marked interest in a controversy that involves alleged violations of important state regulations"); *Metge v. Cent. Neighborhood Improvement Ass'n*, 649 N.W.2d 488, 496 (Minn. Ct. App. 2022) (termination of a non-profit director a matter of public controversy because the non-profit "is imbued with a public purpose, it is substantially supported with public funds, and its activities are routinely reported in the media."); *Howard v. Antilla*, 1999 U.S. Dist. LEXIS 19772, at

*5 (D.N.H. Nov. 17, 1999) ("the 'public controversy' relates to a familiar and often discussed public issue – the performance of a publicly traded company's stock and the various factors (both legal and illegal) that influence, or can be manipulated to effect, the market value of that stock."); *Carroll v. TheStreet.com*, 2014 U.S. Dist. LEXIS 156499, at *37 (S.D. Fla. July 7, 2014) ("medical insurance fraud scheme—corruption in a highly-regulated industry—was speech about a legitimate public controversy"); *West v. Media Gen. Operations*, 2001 U.S. Dist. LEXIS 25230, at *21 (E.D. Tenn. Nov. 13, 2001) (class action lawsuit "became part of and increased the level of public controversy" surrounding the story covered in the allegedly defamatory article, supporting finding that plaintiff was a limited purpose public figure).

Dakota Plains and the legal proceedings related to Reger and Gilbertson's manipulation of the stock prices constitute a public controversy.

### b. Plaintiff injected himself into that public controversy

The second factor considers whether a defamation plaintiff injected himself into the controversy. In other words, did the plaintiff "thrust himself to the forefront of the controversy . . . so as to achieve a 'special prominence' in the debate and become a factor in resolving the controversy." *Chafoulias*, 668 N.W.2d at 653. That is, the question is whether the plaintiff either

> purposely tr[ied] to influence the outcome of the controversy or . . . realistically expected, because of his position in the controversy, to have an impact on its resolution. In undertaking this analysis, we may look to the extent to which [plaintiff's] participation in the public controversy was voluntary, the extent to which [plaintiff] had access to channels of effective communication to counteract false statements, and the prominence of the role [plaintiff] played in the public controversy.

*Id.* (cleaned up); *accord Stepnes*, 663 F.3d at 963-64.

Although there is a sense that a plaintiff must take some willful action to inject himself into a public controversy, "the plaintiff is not permitted to avoid the limited purpose public figure status by protesting 'I didn't want the attention.' The proper question is not whether the plaintiff volunteered for the publicity but whether the plaintiff volunteered for an activity out of which publicity would foreseeably arise." *Chafoulias*, 668 N.W.2d at 653 (cleaned up). As an oft-cited case made clear, when a corporate executive is the one directing the decisions that are the focus of the public controversy, their "activities certainly extend[] beyond those of a profit-maximizing manager of a single firm," and "a reasonable person" would understand that the executive "thrust himself into the public controversies" and constitutes a limited purpose public figure. *Waldbaum*, 627 F.2d at 1300.

In this case, Reger clearly injected himself into the public controversy surrounding his leadership in the oil and gas industry and in the stock manipulation scheme perpetrated at Dakota Plains. In the first instance, he founded both NOG and Dakota Plains—each *publicly traded* firms in the oil and gas industry. In other words, he held two "positions of prominence in an industry with a very limited number of major figures" and "thrust [himself] into this position of prominence by voluntarily entering a strictly regulated, high-profile industry in which there were few major participants," thereby "invit[ing] public scrutiny, discussions, and criticism." *Silvester*, 839 F.2d at 1497; *see also Wells v. Liddy*, 186 F.3d 505, 540 (4th Cir. 1999) ("an involuntary public figure has

pursued a course of conduct from which it was reasonably foreseeable, at the time of conduct, that public interest would arise.").

And more specific to the stock scheme and investigations of the scheme, Reger explicitly acted with the belief that he could exert influence, both before and after the Dakota Plains scheme came under scrutiny.  As the court held in the Dakota Plains shareholder litigation, "[t]here was also sufficient evidence to conclude that Reger 'was in some meaningful sense a culpable participant in the fraud perpetrated by' Dakota Plains." *Gruber II*, 628 F. Supp. 3d at 476, 491.  Further, by Reger's own admission, he "fully cooperated" in the SEC's investigation, and he sued a company he founded— NOG—on the basis that they breached their contract with him and defamed him in their public statements.  Indeed, as he proudly stated in his Complaint, he was the only defendant named in the shareholder lawsuit to not settle, and to instead fight all the way through being found liable by a jury.  *See* Compl. ¶ 8.

Far from avoiding controversy, Reger participated in a scheme to enrich himself, and when the scheme became the subject of numerous investigations, he repeatedly "sought . . . public audience and . . . attempt[ed] to use the court's forum to influence the resolution" of the public controversy.  *See In re IBP Confidential Bus. Documents Litig.*, 797 F.2d 632, 646 (8th Cir. 1986); *see also Metge*, 649 N.W.2d at 496 (Plaintiff "assumed a purposeful and prominent role in those controversies in an effort to influence the outcome of the CNIA board decisions.  She had enhanced media access and used that access to respond to actions taken against her and present her side of the story.").

Further, throughout his career and the resulting controversies, Reger has sought

out and received *extensive* media attention in reports published by *Bloomberg Law,*

*Forbes Magazine,* the *Star Tribune*, and *The Wall Street Journal*, among others. *See*

Walker Decl. (collecting news reports).

Accordingly, Reger has injected himself into the public controversy.

### c.  The challenged statements relate to the public controversy

The final factor this Court must consider in determining whether Reger constitutes

a limited purpose public figure is "whether the allegedly defamatory statement related to

the controversy." *Chafoulias*, 668 N.W.2d at 651.  The statements that Reger challenges

relate to a report on the jury verdict finding Reger liable for securities fraud, which was

thus explicitly connected to the Dakota Plains stock manipulation scheme.  *See* Compl. ¶¶

59-104.  It is without question that the two are related.

***

Based on all three factors, Reger is, at the very least, a limited purpose public

figure for purposes of statements regarding Dakota Plains and the stock manipulation

scheme.

## II.   BECAUSE REGER IS A LIMITED PURPOSE PUBLIC FIGURE, HE MUST, BUT CANNOT, PLAUSIBLY ALLEGE THAT THE AP PUBLISHED THE CHALLENGED STATEMENTS WITH ACTUAL MALICE

As a limited purpose public figure, Reger must plausibly plead that The AP

published the false statements with "actual malice."  *See Chafoulias*, 668 N.W.2d at 648-

49.  He has not done so.  "Actual malice is a term of art; it means that the defendant acted

with knowledge that the publication was false or with reckless disregard of whether it was false or not." *Id*. at 654 (cleaned up). Importantly, "reckless disregard" is a subjective standard: "reckless disregard does not mean recklessness in the ordinary sense of extreme negligence. Instead, [it] requires that a defendant make a statement while subjectively believing that the statement is probably false." *Id.* at 654-55 (cleaned up); *see also St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing."); *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964); *Secrist v. Harkin*, 874 F.2d 1244, 1252 (8th Cir. 1989). In other words, in order for the Report to have defamed Reger, the Court must conclude that the Report is both false *and* that The AP published the Report with actual malice.

Reger pleads a *single* fact to support his claim of actual malice: that the Report linked to *Star Tribune*'s article describing the jury verdict as a finding of liability. *See* Compl. ¶ 42. But this single indicia is insufficient as a matter of law to plausibly establish that The AP published the challenged statements with knowledge of their falsity. As numerous appellate courts around the country have held, a mistake of fact, by itself, is insufficient to establish actual malice. *See Bose Corp. v. Consumers Union*, 466 U.S. 485, 511 (1984) ("[T]here is a significant difference between proof of actual malice and mere proof of falsity . . . ."); *accord Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1091 (3d Cir. 1985) ("Although the lack of truthfulness of a statement is a prerequisite to liability, mere falsity, without more, is generally not sufficient to establish actual malice.").

Indeed, numerous courts have considered fact patterns very similar to what Reger alleges here, and found them insufficient to plead and/or prove actual malice.  For example, in *Blankenship v. NBCUniversal*, the Fourth Circuit Court of Appeals upheld the ruling in favor of publishers who had mistakenly referred to Blankenship as a "felon," when in fact he had served a year in prison on a misdemeanor charge.  In that case a publisher had repurposed an *accurate* report published by The AP, but mistakenly inserted the "felon" reference in their own story.  60 F.4th 744, 767-68 (4th Cir. 2023), *cert. denied*, 2023 U.S. LEXIS 4139 (Oct. 10, 2023).  The Fourth Circuit held that the error was "a simple accident" and was not actionable because there was nothing in the record to suggest that the defendant published the statement with actual malice. *Id*. at 768.

Likewise, in *Kipper v. NYP Holdings*, the New York Supreme Court found a lack of actual malice where the *New York Post* summarized information contained in another report and inserted an error.  12 N.Y.3d 348, 358 (2009).  As the court held, although the information "could be verified through an accurate reading of the Times article, this potentiality does not negate the possibility that [defendants], all working under a deadline, simply misperceived the correct statement in the Times article or draft rewrite." *Id.*  That is, pleading the single fact that The AP *must* have known there was an error in its copy because it had access to another article that got the information correct, is insufficient as a matter of law to plausibly plead that The AP acted with actual malice.

Finally, the Eleventh Circuit Court of Appeals has concluded that linking to an accurate article actually *negates* allegations of actual malice analysis.  *Klayman v. City*

*Pages*, 650 F. App'x 744, 751 (11th Cir. 2016).  That case similarly stemmed from an article that implied *criminal* conduct, but linked to a report characterizing the proceedings as *civil*.  As the *Klayman* court held, "if the defendants actually had been highly aware of the publications' falsity, it is unlikely they would have included source information that refuted any defamatory claims or implications." *Id*.  It further explained, "[e]vidence that an article contains information that readers can use to verify its content tends to undermine claims of actual malice." *Id*.

So too here.  The AP published its report the same day as the *Star Tribune*. Given the numerous overlapping and complex civil and criminal court proceedings that stemmed from the Dakota Plains stock scheme, and working on deadline, The AP made an honest mistake by referring to the jury verdict as a conviction. Indeed, the fact that it linked to the accurate *Star Tribune* article, and the statements in the Report made clear that it was a civil proceeding, are strong indicators that the error was inadvertent and not intentional.

The bottom line is that evidence of mistake, without more, is not evidence of actual malice. *Marcone*, 754 F.2d at 1090-91 (holding that two mistakes of fact appeared "to be the result of insufficient editorial verification and checking procedures, but not of a conscious decision to present [plaintiff] in a false light."); *see also Stepnes*, 663 F.3d at 964 ("Given these facts, it was not reckless disregard for the truth to conclude that Stepnes may face future incarceration related to the contests.").  Reger's single allegation that the *Star Tribune* got it right and The AP linked to that article so it must have known its report was wrong is insufficient as a matter of law to plausibly plead that The AP

acted with actual malice.  Accordingly, Reger's defamation claims fail as a matter of law.[6]

### III.   READ IN CONTEXT, THE CHALLENGED STATEMENTS DO NOT CHANGE THE GIST OR STING OF THE REPORT AND THUS ARE NOT ACTIONABLE.

A finding that Reger is a limited purpose public figure who has failed to plead actual malice is case dispositive.  But even if Reger has somehow adequately pleaded the requisite fault standard, he bears a separate burden to plead and prove material falsity, *see McKee v. Laurion*, 825 N.W.2d 725, 730 (Minn. 2013), which he has not done and cannot do.

The AP fully acknowledges that there is a difference between saying someone was "convicted" versus saying someone was "found liable" by a jury—hence the correction it published within a week of being sued.  But the words characterizing the jury verdict as arising in a criminal matter were *not* published in a vacuum, and the law is clear that allegedly defamatory statements must be read in context, rather than in isolation.  *Id.* at

---

[6] Moreover, even if this Court determines that Reger's defamation claims somehow survive, it should still dismiss Reger's defamation by implication claim.  Under Minnesota law, an implication claim requires the plaintiff to establish that the Defendant *intended* the implication.  *See Johnson v. CBS*, 10 F. Supp. 2d 1071, 1076 (D. Minn. 1998).  Reger does not even attempt to allege that The AP intended the alleged defamatory meaning of its Report.  Further, to the extent Reger premises his implication claim on the Report's linking him to two men who *were* convicted and sent to prison, *see* Compl. ¶¶ 75-77, that implication is substantially true: Gilbertson and Hoskins were convicted for their roles in the same Dakota Plains stock manipulation scheme that is at the center of Reger's many legal woes.

731.  Upon engaging in such contextual reading, the Court must then determine how the

Report—in its entirety—affected the mind of its intended audience. *Id.* at 730.

In the parlance of libel law, the inquiry is whether the statement is "substantially

true," which asks whether the "gist" or "sting" of the Report is true such that the

statement "would have the same effect on the mind of the reader or listener as that which

the pleaded truth would have produced."  *Id.*; *see also Stepnes*, 663 F.3d at 965 (when

reporting on legal issues, "[r]eporters are allowed 'some leeway in accuracy'"); *Lundell*,

98 F.3d at 355.  Similarly, a challenged statement is not materially false—and thus is not

actionable—if the portions of the publication that are not challenged leave the reader with

the same impression as those parts that are challenged by the plaintiff.  *See Masson v.*

*New Yorker Magazine*, 501 U.S. 496, 517 (1991).

Reger's claims hinge on the notion that as a result of the Report, the "business

community" believed that he engaged in criminal conduct.  *See* Compl. ¶ 85.

Specifically, he alleges damages in the form of "several multi-million-dollar

partnerships," loss of insurance, removal from a board position and NOG's website, and

his inability to open up certain investment trading accounts, Compl. ¶¶ 45-53.  In other

words, Reger is concerned about his reputation among those he previously described as

"[s]ophisticated businesspeople and investors," *see* Nascimento Decl. Ex. K at 3, and the

central question for this Court is, therefore, how that audience interpreted The AP's

Report. *See Potomac Valve & Fitting v. Crawford Fitting*, 829 F.2d 1280, 1290 n.36 (4th

Cir. 1987) (where plaintiffs based their case upon alleged injuries to their reputation

within the business community, envisioning the "reasonable reader" as endowed with the

business sophistication of a reasonable industry actor); *Sellers v. Time*, 423 F.2d 887, 890-891 (3d Cir. 1970) (accepting that *Time* magazine readers had a "high level of sophistication" and focusing inquiry on the "impact of the publication on the average reader of *Time*"); *Horne v. Matthews*, 1997 U.S. Dist. LEXIS 14518, at *6 (S.D.N.Y. Sept. 24, 1997) ("An article on the sports page of a newspaper should be viewed from the perspective of the audience to whom it is addressed, i.e., the understanding of 'a sophisticated and sports-conscious reader'" (quoting *November v. Time*, 244 N.Y.S.2d 309, 311 (1963))).

There is no plausible basis for Reger to allege that any sophisticated player in the oil and gas industry—to say nothing of any ordinary reader—was misled by the Report into believing that Reger had been convicted of criminal activity and was going to prison. For example, while Reger complains about the statement that he had "been convicted in a stock manipulation scheme," the Report also noted that the jury's verdict "wrapp[ed] up *a shareholder lawsuit*," that the judge had previously approved "*a $14 million settlement between Dakota Plains shareholders and several other directors and executives*," and that the judge had yet to decide on "*any damages Reger must pay to shareholders*." Compl. Ex. C. (emphases added).

What's more, the rest of the Report—which Reger does not, and cannot dispute—carries the same gist or sting as those few statements he claims defamed him. For example, the later statement in the article that "Reger and Gilbertson intentionally manipulated the price of Dakota Plains stock in its first 20 days of trading" is *absolutely true* and Reger does not challenge it. It strains credulity to believe that the mere use of

the term "convicted" is what allegedly harmed Reger's reputation, as opposed to accurate reporting on his scheme to defraud investors and the related consequences of that scheme. *Gruber I*, 2021 U.S. Dist. LEXIS 113729, at *4

In short, the jury verdict is but a part of the Report, which accurately described Reger's underlying involvement in the stock manipulation scheme and gave sufficient detail to readers to understand that the verdict against Reger came in a civil matter. It is absurd for him to allege that he lost out, for example, on "multi-million-dollar partnerships" because a prospective business partner read the headline to The AP's Report and based a high-stakes decision upon that headline and nothing more. Indeed, it is much more plausible that Reger has been unable to reboot his career as an oil man (or as an executive in any publicly-traded industry) because his own conduct prior to publication of the Report destroyed his reputation among those who are in a position to hire, promote, or partner with him—and who, given the sophisticated and insular world in which they operate, presumably have very in-depth knowledge of his history. There simply is no reason to believe that the unfortunate but fleeting word choices in The AP Report changed the gist or sting of the undisputed facts: a jury found him liable for stock manipulation, and he had paid $8 million to settle SEC charges related to the scheme.

## IV.  REGER'S IIED CLAIM ALSO FAILS AS A MATTER OF LAW

It is an axiom of First Amendment jurisprudence that plaintiffs cannot seek to avoid the protections afforded speech by reconstituting their defamation claims as ones for IIED. *See Hustler Magazine v. Falwell*, 485 U.S. 46, 57 (1988); *see also Guzhagin v. State Farm Mut. Auto. Ins.*, 566 F. Supp. 2d 962, 969 (D. Minn. 2008) ("a Minnesota

plaintiff is not permitted to avoid defenses to a defamation claim by challenging the defamatory statements under another doctrine").  Yet in pleading that The AP is liable for IIED because of the same mistake that forms the basis of his defamation claims, Reger seeks to do just that, and on this basis, Reger's claim should be dismissed.

Further, Reger fails to plead *any* facts by which to plausibly establish any of the four elements of his claim, which include:  "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe."  *See Hubbard v. United Press Int'l*, 330 N.W.2d 428, 438-49 (Minn. 1983).  This test requires that the conduct "be so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community," and that the emotional distress "be so severe that no reasonable man could be expected to endure it."  *Id*.

As the Minnesota Supreme Court made clear, there is a "strong policy" against "fictitious and speculative claims."  *Id*.  Yet that is exactly what Reger pleads here. While The AP's reference to the jury verdict as a conviction was technically incorrect, the error was neither intentional nor reckless.  Nor, either, has Reger pleaded any facts by which to plausibly allege that he has endured *any* emotional distress, let alone stress that no reasonable person could endure it.  On any of these bases, the Court should conclude that Reger's claim is precisely the type of fictitious and speculative claim courts have long cautioned about and guarded against, and his claim should be dismissed with prejudice.

## CONCLUSION

For the reasons stated herein, Reger has failed to plausibly plead the necessary elements of his claims.  Because amendment would be futile, The AP respectfully requests that the Court dismiss Reger's claims with prejudice.

BALLARD SPAHR LLP

Dated: October 31, 2023

By *s/ Leita Walker*
Leita Walker (No. 0387095)
Isabella Salomão Nascimento (No. 0401408)
80 South Eighth Street
2000 IDS Center
Minneapolis, MN 55402-2119
Tel: (612) 371-3211
*walkerl@ballardspahr.com*
*salomaonascimentoi@ballardspahr.com*

Emmy Parsons (*pro hac vice*)
1909 K Street NW, 12th Floor
Washington, D.C. 20006
Tel: (202) 661-7603
*parsonse@ballardspahr.com*

*Attorneys for Defendant The Associated Press*